# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 18, 2011

## BARRY WAYNE DUNHAM v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Macon County**
**No. 97-71  David E. Durham, Judge**

---

**No. M2010-02586-CCA-R3-PC - Filed February 9, 2012**

---

The Petitioner, Barry Wayne Dunham, appeals the Macon County Criminal Court's denial of post-conviction relief from his conviction for first degree murder, for which he is serving a life sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

A. Russell Brown, Lafayette, Tennessee, for the appellant, Barry Wayne Dunham.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Robert Hibbett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts resulting in the Petitioner's conviction were stated by this court in the direct appeal:

> On June 2, 1997, the Macon County Grand Jury charged the defendant with premeditated first degree murder for the April 23, 1997, shooting death of his father, Clinton Dunham. On October 5, 1998, the defendant pled guilty to second degree murder in exchange for a twenty-five-year sentence. However, he was later granted post-conviction relief on the basis that his sentence, which was ordered to be served at 85% parole release

eligibility rather than the 100% required by the violent offender statute, was illegal and his guilty plea therefore unknowing and involuntary. See Barry Dunham v. State, No. M2000-02557-CCA-R3-PC, 2002 WL 242356, at *1 (Tenn. Crim. App. Feb.11, 2002). The defendant was subsequently tried before a jury, found guilty of first degree murder, and sentenced to life imprisonment.

. . .

According to the State's proof, the defendant killed the victim with a single rifle shot to the head at close range as the victim lay either asleep or passed out on his couch in his home in Red Boiling Springs.[1] The defendant wore gloves to avoid leaving fingerprints and obtained the murder weapon, a 30-30 rifle, from the victim's home. After the shooting, the defendant leaned the rifle against an inside wall near the back door and immediately drove to Gamaliel, Kentucky, where he spent the night with his girlfriend before returning early the next morning to "discover" the victim's body and call 9-1-1. Although he initially denied any involvement in the crime, he eventually made a full confession. Accordingly, his trial defense strategy included an attempt to show that the killing occurred in self-defense and that the lingering effects of his earlier stroke, combined with his intoxicated state, prevented him from forming premeditation. To that end, he presented proof, among other things, that the victim was an alcoholic and a violent and abusive man. He also presented evidence that the victim was under indictment for the murder of Joe Frank Newberry at the time of his death and had stated his intention of killing two of the witnesses who planned to testify against him at his upcoming trial.

---

[1]Evidence supporting the State's theory that the victim was asleep or unconscious at the time of his death included the defendant's statement as well as the position in which the victim's body was found, with his head on a pillow, arms crossed over his stomach or chest, blanket covering his body from feet to mid-torso, and partial denture removed from his mouth and lying on top of the blanket on his stomach. In addition, the pathologist who performed the autopsy of the victim's body testified his blood-alcohol level was .12% and his urine drug screen was positive for benzodiazepines at the time of his death.

Special Agent Roy Copeland of the Tennessee Bureau of Investigation ("TBI") conducted the initial interview of the defendant at the crime scene on April 24, 1997. At that time, the defendant claimed the victim was asleep when he last saw him the previous evening at 9:00 or 9:15 p.m. before leaving to spend the night with his girlfriend in Kentucky. Agent Copeland acknowledged he learned during the course of his investigation that the victim was a heavy drinker and that he had a reputation as a violent man.

On May 5, 1997, TBI Special Agent Jason Locke interviewed the defendant at the Macon County Sheriff's Office. During that interview, the defendant stated that he had spent the morning of Wednesday, April 23, 1997, at the victim's house with the victim and Cynthia Denham, where they discussed the victim's plans for burning his house to collect insurance money to pay his attorney's fees. The defendant also stated that the victim admitted to him in February 1997 that he had killed Newberry and shot at Newberry's wife, Francis, because Newberry had stolen some chainsaws from him.

On May 6, 1997, Agent Locke conducted a second interview in which the defendant ultimately confessed he shot and killed the victim after the victim told him of his plans to kill Francis Newberry and James Lyons, a friend of the defendant's, in order to prevent them from testifying at the victim's murder trial. The defendant's May 6 statement, which Agent Locke read aloud to the jury, states as follows:

> On Wednesday, April 23, 1997, we had a bunch of friends over at the pool room behind my dad's house. Before everyone got there, [D]ad and I had been talking in the pool room. We talked about me having a cocaine problem and I told him I didn't have one. We also talked about him burning the house down the following Friday night for insurance money to pay his attorney. I had been helping him, and Cynthia Denham, move furniture and other things out of the house over the past week.

Dad told me he was going to kill Francis Newberry before he was going to leave town early Saturday morning. He also said he was going to kill James Lyons because they were both going to testify against him. When he started telling me about James, he could tell I was getting upset and he said, "[L]et's just drop it."

I helped him move a couple of chairs & a loveseat out after that and everybody came over a little while later.

Dad went inside at about 8:00 p.m. to go to sleep and everyone else left at about 8:15 p.m. I left the pool room at about 8:30 p.m. and went to my trailer next door. I called my wife in Myrtle Beach, S.C. & talked to her for 15-25 minutes.

I then walked over to [D]ad's & got a pack of cigarettes and hung up the cordless phone. I walked back to the trailer. I thought about James who used to be a good friend of mine and what [D]ad had said about killing him. I had been drinking and still was. I called Sabrena Green and she asked me to come over and I told her I would be over in 30 minutes to an hour. I changed clothes & put on my new blue jeans & cologne. I was headed out the door. I took a big drink of Canadian Mist and the thought hit me about killing [D]ad. I put my cup and liquor in the car and sat down inside the car and lit a cigarette. I put it in the ashtray and got out.

I walked to the back door and went inside. I knew there was no way to wake [D]ad up. I got the 30-30 rifle from behind the kitchen door and cocked the rifle twice & put two shells in the floor to make it look like a woman had done it.

I walked up to the couch where [D]ad was and put the gun about a 1/2 inch to an inch away

from his head and shot him. I turned around and walked out, shut the back door after putting the rifle against the wall and left. Before I had gone inside the house, I put on a pair of gloves that was on the back deck under a duck [sic] on top of the well house so I wouldn't leave any fingerprints. I don't know what happened to the gloves.

I left and went to Sabrena's. I came home the next morning and got there at 6:10 a.m. I changed clothes and walked over to [D]ad's. I made the phone call to Sandy [defendant's sister] and then to 911 and then walked down to the trailer and got Timmy [defendant's half-brother] up.

Macon County Sheriff Joe Ferguson, who participated in the May 6 interview, testified that after being interviewed for some time, the defendant looked him in the eye and said, "Joe, you have got me." When he asked the defendant what he meant, the defendant replied that he had killed his father and went on to give the statement about the killing. Sheriff Ferguson testified he was also present later that night at the jail when one of the defendant's sisters asked the defendant if he had killed their father and the defendant replied, "[Y]es, I did." Sheriff Ferguson acknowledged that the victim was under indictment for the murder of Joe Frank Newberry at the time of his death and that the defendant replied to his sister, when she asked him why he had committed the crime, "because it was never going to stop," or words to that effect.

Timothy Gravens, the defendant's half-brother by the same mother, was sharing a house trailer on the victim's property with the defendant at the time of the shooting. He described the defendant and the victim's relationship as "pretty rough," testifying that the victim had threatened to shoot the defendant and burn his car and that both men had made comments to him at various times about killing the other. He acknowledged the victim, in addition, had commented to him about killing Newberry and the witnesses to Newberry's murder, Francis Newberry and James Lyons. He further acknowledged

-5-

the victim often mistreated the defendant, calling him "worthless" and telling him he "wasn't no good," and the victim was violent to other people and abusive to animals. Gravens was aware of the victim's plans to burn his house and was present at the jail when the defendant said the reason he killed the victim was "because it was never going to stop."

Roger Dale Denham, the victim's brother, testified the defendant told him in a conversation the week before the shooting that the victim was getting on his nerves and he wanted him back on the boat. Denham later explained that the victim worked on a river barge and was regularly absent from home for weeks at a time. Denham testified the victim left Macon County when the defendant was a small child and remained away for years because he "got in so much trouble" with the law over "break ins and everything." He conceded the victim "was a little mean" and had a reputation as a violent man when he was "on the liquor." According to Denham, the victim once shot a jukebox in a bar, at another time fired his pistol in a bar, causing a bullet to ricochet off the wall, and at yet another time threatened to shoot Denham's girlfriend.

Donna Trisdale, the defendant's sister, testified the victim and the defendant did not have a good relationship and got into arguments whenever they were together. She said when she and her siblings asked the defendant at the jail why he had killed their father, he replied that "it had to be stopped." Trisdale testified on cross-examination that the victim was sober only about half the time and that she avoided him when he was drinking. She acknowledged the victim told her he killed Newberry because Newberry stole two chainsaws from him and that the victim also told her of his plans to burn his house.

The first witness the defendant presented in his defense was his younger sister, Sandy Dugan. Dugan testified the victim left home when she was six weeks old and the defendant was one or two years old. During the years that followed, she remembered meeting the victim when he returned for a visit when she was eleven and seeing him again during visits when she was approximately thirteen and sixteen. In 1991, the victim bought the property he owned at the time of his death and, in

1992, moved into the house located on the property. Dugan characterized the victim's relationship with the defendant as "good" except when the victim was drinking, which she acknowledged occurred frequently. She said the victim was often "ill and hateful" when on one of his drinking binges, and she related an incident in the kitchen of his home when he suddenly pulled out a gun and fired a shot that narrowly missed her. According to Dugan, the victim told her before Newberry's murder that he planned to kill Newberry and bury his body in Hippie Hollow. After the murder, the victim told her he was going to have to kill the witnesses, specifically, Francis Newberry and James Lyons.

Dugan testified the defendant suffered a severe stroke in September 1996 that initially paralyzed the right side of his body and rendered him unable to speak, walk, or care for himself. Despite his eventual partial recovery, the defendant was not "the same person" after his stroke. The defendant was at her home the evening of Wednesday, April 23, 1997, when the victim telephoned and said, "[Y]'all get y'all's a-s-s out here." Recognizing from the victim's voice that he was drunk, she made an excuse about attending church but dropped the defendant off at the victim's house as the victim instructed.

Dugan explained that she knew what the defendant meant when he told her that he had killed the victim because it was "never going to stop":

> [A]nd I said, Barry, why did you do it? And he said because it wasn't [sic] never going to stop. I said, regardless, you killed Daddy, and he started crying and he said, I had to do it. I had to do it so it would stop, and I knew what he was going through and what he felt, because I knew all of this stuff that was going on and it shouldn't have been going on, wasn't supposed to be that way. It's not supposed to be that way.
>
> Q. By that, you mean the killing of witnesses?

A. Yeah, just the way it went in general, just the way it all went, just wasn't supposed to be that way. There was [sic] positions and situations that we should never have been put in, things we never should have seen and experienced. He was doing things our kids going to school was [sic] having to hear about. People was [sic] calling me at the factory and would say, do you know what I heard your daddy done [sic] last night? Me and Donna [sic] would leave and go find Daddy, find out what in the world he'd done. It was just something all the time.

The defendant testified he currently lived in the victim's house and that he received social security disability benefits as a result of his stroke. He said he did not have any kind of regular relationship with the victim until March 1996 when he came back to Tennessee and moved in with Gravens, who was living in the trailer beside the victim's home. He characterized his relationship with the victim as good when the victim was sober but bad whenever the victim was drinking, which was often. He said that on one occasion when he refused to do something the victim had asked, the victim pulled a .38 from a cabinet and fired six shots at him, three between his legs as he was sitting at the table and three more after he had run outside onto the deck. He also described another occasion in which the victim threatened him when he was reluctant to let the victim use his car. Further, he corroborated Dugan's testimony that he was present at the time the victim fired his gun at Dugan.

The defendant testified his severe stroke, which occurred on September 6, 1996, left him unable to speak with any clarity for three or four months and unable to walk without the assistance of a walker or cane. During his recuperation, the victim, when drinking, "always put [him] down," telling him that he would "never be worth a shit again and things like that." The defendant testified the victim described to him how he had killed Newberry. He said the victim told him he shot Newberry as he and Mrs. Newberry were going out the door, tried for Mrs. Newberry but missed, followed Newberry to his truck, shot him again, instructed Lyons to come pick him up at Hippie Hollow,

and then drove Newberry in his truck to Hippie Hollow, where he shot him six more times. The defendant said the victim also spoke several times with him about his plans to burn his house and, on the evening of April 23, 1997, told him he was "going to get rid of" James Lyons and Mrs. Newberry before renting a car on Friday or Saturday and leaving town. That same night, the victim told him to retrieve the dynamite that he and Lyons, per the victim's instructions, had earlier buried.[2]

The defendant testified he had taken a morphine pill that afternoon and had also consumed about a half-gallon of whiskey. He said he donned the gloves with the intention of retrieving the dynamite but went directly inside the victim's house, picked up the murder weapon, and shot the victim. He testified he "was scared because [the victim] made the statement that he wasn't going to leave any witnesses, and he was a dangerous man." In addition to the victim's other violent acts, the defendant was aware of the victim's having shot a man in the buttocks and kneecap in a bar and having fired shots in a bar on another occasion in order to clear people from the pool table.

On cross-examination, the defendant conceded that the victim did not like cocaine usage but denied that the victim would have forced him to move out of the trailer if the victim had found out he was using cocaine. He further denied the "thought hit him" about killing the victim or that he sat in his car for a while before entering the house. He testified he did not eject the shells on the floor to make it appear as if a woman had committed the crime, as he reported in his May 6 statement, but the rifle had failed to fire when he first pulled the trigger and he had returned to the kitchen to check if a bullet was in the chamber:

---

[2]James Lyons later testified that he remembered the victim's having instructed him and the defendant to hide the dynamite, which, he said, they buried in Hippie Hollow. During his cross-examination testimony, Sheriff Ferguson acknowledged a dynamite cap and possibly one stick of dynamite had been uncovered on the victim's property.

The reason the two shells were in the floor is because I went in to-at first when I was going to kill him, I guess I didn't have a bullet in the chamber so it didn't go off or misfired or something. I don't think there was a bullet in the chamber, so I walked back in the kitchen, ejected two shells out and walked back in there.

The defendant claimed he was not aiming at the victim's head when the fatal shot was fired but, instead, was holding the weapon down at his side when the back door slammed shut and the gun discharged.[3] He said he was not himself because of the severe brain damage he had suffered and insisted he made no decision to kill the victim. Asked whether "it [was] self-defense or ... an accident or [he] just didn't know what [he was] doing," the defendant replied that he "really didn't know what [he] was doing."

Francis Newberry related the events of January 16, 1997, when her husband was murdered, describing how she heard popping sounds as she and her husband were leaving the victim's house, looked back to see her husband fall, and then ran when he told her the victim had shot him and instructed her to flee. She said the victim was an "ill-like person" and a violent man and she was afraid of him. She had never heard the victim threaten the defendant but had heard him say mean and hateful things to him. James Lyons, who was present at the victim's house on January 16, 1997, described the victim's killing of Newberry[4] and said the victim was violent when he was drunk.

Kenny Frazier described a number of violent episodes involving the victim. He testified the victim twice threatened

---

[3]During the State's case in chief, TBI Special Agent Steve Scott, a firearms expert, testified that at the time he examined it, the murder weapon, including its safety mechanism, was in proper working condition.

[4]Lyons' account essentially corroborated the details the defendant testified the victim had provided to him about the murder.

him, on one occasion shooting a gun around his feet and on another occasion pulling a gun and threatening to shoot him. He said he also witnessed the victim empty his gun into a car radio because he did not like the music, shoot a jukebox because a rock and roll song came on instead of the country music he requested, shoot stray animals that came onto his property, and pour alcohol on an African-American man in a bar and attempt to set him on fire with a lighter. Frazier additionally testified he was at the Valley View Tavern one night when a Mr. Tuck was shot. Although he did not witness the actual shooting, the victim was the only one present who had a gun.

Vesper Newberry, the owner of the Valley View Tavern, confirmed that a man had been shot one night after closing time outside his tavern and that the victim had been present in the tavern before closing. He said the victim did not have a good reputation in the community.

Dr. Pam Auble, a neuropsychologist, testified the defendant had a full-scale I.Q. of 75. She said she diagnosed him with dementia resulting from his stroke and from alcoholism, and she opined that these factors prevented him from being able "to exercise reflection and judgment at the time of [the] offense." Dr. Keith Caruso, a forensic psychiatrist, testified he interviewed the defendant and reviewed Dr. Auble's report and concurred in Dr. Auble's findings and results. Specifically, he diagnosed the defendant with an anxiety disorder not otherwise specified ("anxiety disorder NOS"), dementia due to stroke, chronic alcohol abuse, polysubstance abuse, and alcohol dependence, as well as alcohol intoxication at the time of the offense. Dr. Caruso testified the defendant's anxiety disorder NOS caused him to have "a tendency to misperceive or inaccurately judge the degree of threat that was posed at a particular time," and his dementia created problems for him with "reasoning and planning." In sum, he thought there was "a lot to suggest" that at the time of the offense the defendant "was not free of passion and excitement." He acknowledged, however, that it was "certainly" possible the defendant had acted with premeditation.

State v. Barry Wayne Dunham, No. M2003-02802-CCA-R3-CD, Macon County (Tenn. Crim. App. Mar. 1, 2005) (Tipton, P.J., dissenting), perm. app. denied (Tenn. Oct. 24, 2005). The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel because counsel failed to pursue a motion to suppress and used one expert witness but failed to use another expert witness or witnesses.

At the post-conviction hearing, the forty-two-year-old Petitioner testified that he was thirty-four years old at the time of his trial. He said that at the time of his father's death on April 23, 1997, he lived beside his father. The Petitioner suffered a stroke on September 6, 1996, from which he was disabled. He said that he had "severe brain damage," that he was paralyzed on the right side of his body, and that he had difficulty walking, talking, and eating. He explained that the stroke also affected him mentally and said, "I just wasn't myself." He received Social Security Disability payments due to his condition.

The Petitioner acknowledged that he drank alcohol "pretty much daily" at the time he gave statements to law enforcement. He did not recall drinking on the morning he took a polygraph examination but said he took Xanax, which was not prescribed for him. He said he also smoked marijuana and took morphine around the time he gave the statements. He said he wrote better than he read and thought he quit school in the sixth grade. He did not recall whether law enforcement officers read him his rights in April before he signed the waiver of his rights. He said he was just beginning to be able to sign his name with his right hand.

The Petitioner testified that in his first statement following the polygraph examination, he was at the Macon County Ambulance Service with TBI Agent Jason Locke, Roy Copeland, and Sheriff Joe Ferguson. He said Agent Locke informed him that he "failed it ninety nine point nine percent" and that it would help him in the long run to admit what happened. He said he was not able to think clearly at the time, nor was he able to do so two days or two months later.

The Petitioner testified that after he was arrested, jailed, and appointed counsel, he pled guilty to second degree murder, although he was later granted post-conviction relief from that conviction due to a sentencing error. He and his trial counsel began preparing for trial. He said that counsel never discussed filing a motion to suppress his statements or explained why a motion to suppress would not be filed. He said there was no discussion of the effect of his pretrial statements being admitted at the trial. The Petitioner did not recall any objection to his statements being read at his trial. He acknowledged that he and counsel discussed whether he would testify at the trial. He said he left to counsel the decisions about which witnesses to call. He said that he did not want to testify but that counsel called him the night before and told him he needed to testify. He said he used alcohol and drugs while he was released on bond before the trial.

-12-

The Petitioner testified that the defense was based upon his examinations with Dr. Ann Goetting, Dr. Pamela Auble, and Dr. Keith Caruso. He said he met with Dr. Caruso once for thirty to forty-five minutes, which he said was not enough time to discuss the relevant facts. He said he was not asked to provide any other information to trial counsel for Dr. Caruso, nor did he meet with trial counsel about Dr. Caruso's anticipated testimony. He said that he met with Dr. Goetting four or five times and that they spent several hours together. He thought he met with Dr. Auble three times. She gave him several tests and determined that his IQ was 75, which he acknowledged was in the "borderline retarded" category.[5]

The Petitioner testified that he met with Tom Bilbrey, an assistant public defender who represented him, about once every three months from early 2001 until February 2003. He said that he and Mr. Bilbrey had a good relationship and that he did what Mr. Bilbrey told him. He said that in addition to his stroke, his alcohol and drug use and the events that were occurring at the time affected his cognitive ability. He thought that since 1996, he had improved greatly from the effects of his stroke.

On cross-examination, the Petitioner testified that his trial was in 2003, about six years after his stroke. He agreed that he originally pled guilty and said the conviction was set aside because he was not advised that he would have to serve 100% of his sentence. He said he discussed his involvement in his father's death with his attorneys and did not recall ever denying that he killed his father. He later said, "We never talked much about what my testimony was going to be." He also claimed he could not recall whether they discussed his prospective testimony. He did not recall telling his attorneys that he was present when his father died. He did not recall giving his statement that he retrieved a rifle from behind the kitchen door, cocked it, and placed two shells on the floor to make it look like a woman killed the victim. He did not recall but did not deny testifying that there were two shells on the floor because there were no bullets in the chamber when he was going to kill the victim, that the gun did not fire or misfired, and that he walked to the kitchen and ejected two shells. He neither recalled nor denied other trial testimony related to the crime. He said he was not denying at the hearing that he was present when his father died or that he had a weapon in his hand. He did not know how many motions his counsel filed. He denied knowing that the defense filed a motion to suppress the 9-1-1 recording.

_____

[5]We note that on April 9, 2010, the General Assembly ordered all references to "mental retardation" in Tennessee Code Annotated to be changed to "intellectual disability." See 2010 Tenn. Pub. Acts 734. The testimony of the witnesses is provided as given.

The Petitioner did not recall telling Dr. Caruso that he intended to kill his father, but he did not deny that he made the statement. He did not recall Dr. Caruso testifying that although the Petitioner said he did not intend to kill the victim, the Petitioner could not have premeditated the killing. When asked whether he was present at his trial, he said, "My body was, my mind wasn't." He did not recall if he told counsel to take his case to trial.

On redirect examination, the Petitioner testified that there were settlement negotiations for him to plead guilty and receive a sentence of twenty-five years to be served at 100%, but claimed he was told the sentence would be served at eighty-five percent. He did not recall attending any motions hearings, including a hearing on a motion to suppress the 9-1-1 recording. Likewise, he did not recall whether the recording was played for the jury. He acknowledged that he still had memory problems.

One of the Petitioner's two attorneys, Tom Bilbrey, testified that he was appointed to represent the Petitioner following the grant of post-conviction relief. He said he had practiced law for thirty-one years and had tried other first degree murder cases. At the time, he was an assistant public defender, and the Petitioner's other attorney, Comer Donnell, was the district public defender. He said he might have worked on the Petitioner's case more because he was local, but he did not know if he was the lead attorney. He said that he met with the Petitioner to prepare for trial and that the public defender's investigator probably met with the Petitioner more than he did.

Mr. Bilbrey testified that he had known the Petitioner since the Petitioner was four or five years old, when the Petitioner was enrolled in a Head Start program where counsel had been employed. He described the Petitioner as a cooperative client and active in the defense.

Mr. Bilbrey said that to his knowledge, the defense did not file a motion to suppress the Petitioner's statements. He said no oral motion was made to suppress the statements at the trial. He could not recall whether there was any discussion of trying to have the statements suppressed. He said that at the trial, the statements were displayed with an overhead projector and that the Petitioner was asked line-by-line whether a statement was true. Mr. Bilbrey said the Petitioner admitted in the statements that he killed his father. He said that although the statements were damaging, the defense was based upon showing self-defense and defense of others. He said there was also proof about the Petitioner's stroke and diminished mental capacity. He said that he knew from the beginning that the Petitioner wanted to testify but that the Petitioner testified differently than the facts the Petitioner gave in the statements. He said this was particularly the case about the gun not firing and the Petitioner going into the kitchen, ejecting shells, and returning to the victim.

Mr. Bilbrey testified that the Petitioner had been "victimized" by the victim. He described the victim as a vicious, violent man. He said it was reasonable to believe that the

Petitioner lived in fear of the victim. He said that the victim had been charged with murder and that there was proof the victim planned to kill two witnesses in the murder case.

Mr. Bilbrey testified that he did not recall whether the Petitioner made inculpatory statements in addition to the statements to law enforcement. He thought the change in the Petitioner's version of events was the reason the Petitioner was convicted. He said that it was theoretically possible that no trial would have occurred if the statements had been suppressed but that he did not know.

Mr. Bilbrey testified that although the Petitioner's education was limited, the Petitioner seemed to understand their conversations. He said he knew about the Petitioner's background and IQ. He did not recall any concerns that the Petitioner's IQ and history of a stroke affected the Petitioner's ability to waive his rights and give a statement. He said there were several pretrial motions, although he could not remember whether he or co-counsel argued the motion to suppress the 9-1-1 recording. He said that he did not always file a motion to suppress pretrial statements in murder cases and that sometimes it was advantageous for a defendant's statement to be admitted.

Mr. Bilbrey testified that he counseled his clients to ask themselves what they could add to their defense by testifying. He said he reviewed the "pros and cons" with them and pointed out anything that would not be proven other than through the defendant's testimony. He said he would never tell a client whether the client could or could not testify.

Mr. Bilbrey testified that he argued for admission of Dr. Goetting's testimony. He said he did not know at the time that the trial judge had any propensity to rule against admission of a sociologist's testimony. He said he disagreed with the trial judge's ruling and noted that one of the appellate judges agreed with him in the Petitioner's direct appeal. He said that Dr. Goetting was a prominent expert in spousal abuse and the battered spouse defense but that she had never testified about abuse involving a parent and a child.

Mr. Bilbrey testified that Dr. Auble's testimony was favorable to the defense. He said that Dr. Caruso's testimony changed from direct examination to cross-examination. He said that Dr. Caruso testified about the lack of premeditation but then changed his opinion after the prosecutor had him listen to the 9-1-1 recording and asked the doctor whether the Petitioner told him facts to which the Petitioner testified. He said that Dr. Caruso "didn't completely change his testimony but . . . conceded that maybe [the Petitioner] did premeditate." He was extremely disappointed in Dr. Caruso's testimony. He said that he and co-counsel met with Dr. Caruso before the trial to review Dr. Caruso's testimony, which he said "was basically consistent with what he testified to on direct." He thought that two investigators might have attended the meeting but did not think the Petitioner was present. He noted, however, that the Petitioner met with Dr. Caruso before the trial and that he

presumed the Petitioner gave Dr. Caruso the same factual information as was in the Petitioner's statements. He said he was not present for this meeting. He said his normal practice was to make most discovery materials available to an expert witness, but he could not recall whether Dr. Caruso had the 9-1-1 recording before the trial. He said he and Mr. Donnell had no way of knowing that Dr. Caruso would change his opinion.

Mr. Bilbrey testified that he had no way of knowing that the Petitioner would testify to different facts than those reflected in the statements. He thought he asked the Petitioner what happened on the night of the crime. He said he had not previously heard about the gun failing to fire, the Petitioner going to the kitchen to eject shells, the Petitioner returning to the victim's location, the door slamming, and the gun "just go[ing] off."

Mr. Bilbrey testified that he did not recall the trial judge ever limiting him in offering expert proof other than in the case of Dr. Goetting at the Petitioner's trial. He could not recall whether he and co-counsel considered or investigated other expert witnesses for the Petitioner's trial.

Mr. Bilbrey testified that he did not have any documentation in his file of a motion to suppress. He said that in hindsight, he thought a motion to suppress would have been unsuccessful but conceded, "Anything is possible."

On cross-examination, Mr. Bilbrey agreed that the number sixteen sounded correct as the number of motions filed by the defense. He said he met with all three experts before the trial. He said Dr. Caruso gave no indication that he was wavering in his opinion about diminished capacity and the lack of premeditation. He said, "It was right the opposite."

The State did not present any proof. After considering the evidence, the trial court found that the defense strategy from the beginning of the case was self-defense and that the failure to pursue suppression of the Petitioner's pretrial statements was "a purposeful strategic move, not an ineffective omission." The court found that the Petitioner failed to show that there was a reasonable probability that even if the Petitioner had filed and prevailed upon such a motion, the outcome of the trial would have been different. The court also found that counsel could not have foreseen that the trial court would exclude Dr. Goetting's testimony or that Dr. Caruso would testify favorably for the State during cross-examination. The court found that both the exclusion of Dr. Goetting's testimony and the turn of events with Dr. Caruso's testimony were matters that could happen in any proceeding and did not reflect on the competence or effectiveness of the Petitioner's attorneys. The trial court noted that Mr. Bilbrey testified that he had known the Petitioner for a long time and was familiar with the Petitioner's traits and intellect and that the Petitioner was cooperative and active in his defense. The court found that the Petitioner failed to present any evidence of experts who would have testified favorably in his defense. The trial court denied relief.

-16-

On appeal, the Petitioner contends that the trial court erred in denying his claims that trial counsel were ineffective (1) in failing to file and pursue a motion to suppress his pretrial statements, (2) in their use of expert witnesses, and (3) in failing to present expert proof that he lacked the mens rea for first degree murder. The State contends that the trial court did not err in finding that the Petitioner failed to prove his claims. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because a petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court

stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

The Petitioner claims that counsel were ineffective in failing to file and pursue a motion to suppress his pretrial statements. Trial counsel testified that the defense strategy was to show self-defense and defense of others. The Petitioner's defense also involved evidence that the victim was a violent man and that he had tormented the Petitioner. The defense never sought to show that the Petitioner did not kill the victim. The Petitioner's pretrial statements included evidence that the victim killed a man who stole chainsaws and shot at the man's wife, that the victim planned to burn a house to collect the insurance proceeds to pay his attorney's fees, and that the Petitioner killed the victim after the victim advised him of plans to kill two people to prevent them from testifying against the victim. The Petitioner also described the circumstances and manner in which he killed the victim. The Petitioner's statements, including his admitting he shot the victim, demonstrate that the circumstances in which he did so were consistent with theories of self-defense and defense of others. Although there was proof that the Petitioner suffered cognitive effects from a stroke, used alcohol and drugs regularly, and had a borderline intellectual disability, there was also proof that the Petitioner did not exhibit impairment. Mr. Bilbrey testified that in retrospect, he saw no basis for a meritorious motion to suppress the statements. The evidence does not preponderate against the trial court's conclusions that trial counsel's performance was not deficient and that the Petitioner failed to prove prejudice. The Petitioner is not entitled to relief.

The Petitioner also claims that counsel provided ineffective assistance by their use of Dr. Goetting, whose testimony the trial court excluded, and Dr. Caruso, who testified unfavorably to the defense on cross-examination, as expert witnesses. Regarding Dr. Goetting's testimony, we note that the majority of the court in the Petitioner's direct appeal held that the trial court did not abuse its discretion in excluding her testimony as an expert, on the basis that her testimony was neither reliable nor relevant, but the dissent concluded that the trial court should have allowed the testimony. See Barry Wayne Dunham, slip op.

-18-

(Tipton, P.J., dissenting). In any event, Mr. Bilbrey testified that he did not know the trial court would exclude Dr. Goetting's testimony because she was a sociologist. There was no proof at the post-conviction hearing that the trial court had such a policy of which trial counsel should have been aware. We conclude that the Petitioner has not shown that counsel's performance was deficient.

We also conclude that the Petitioner did not demonstrate that he was prejudiced by counsel's performance. He did not offer testimony of an expert witness other than a sociologist relative to homicide related to parent/child abuse. Without proof of a different expert whose testimony the trial court would have admitted, he has not demonstrated that he was prejudiced by counsel's reliance on Dr. Goetting, to the exclusion of a different expert witness who would have been allowed to testify. The Petitioner is not entitled to relief on this basis.

As for the Petitioner's claims relative to Dr. Caruso, Mr. Bilbrey testified that he met with Dr. Caruso, as did the Petitioner on a separate occasion. Counsel did not know whether Dr. Caruso reviewed the 9-1-1 recording before the trial, but he testified that Dr. Caruso's concession on cross-examination that it was possible the Petitioner premeditated the killing was after Dr. Caruso both heard the 9-1-1 recording and learned of the Petitioner's testimony that was at odds with the pretrial statements. Counsel testified that his usual practice was to provide expert witnesses with the relevant discovery. A review of Dr. Caruso's report, which was an exhibit at the post-conviction hearing, does not support a conclusion that Dr. Caruso was provided with the 9-1-1 recording before the trial. The report lists over 100 items provided to the expert, none of which is designated as a 9-1-1 recording. We have reviewed the record from the Petitioner's direct appeal and note that Dr. Caruso testified on cross-examination that he had not heard the 9-1-1 recording.

Even if counsel's failure to provide the 9-1-1 recording to Dr. Caruso was deficient, the Petitioner cannot overcome the effect his own trial testimony had on Dr. Caruso's testimony on cross-examination. The Petitioner testified at the trial that he fired the rifle at his father, that it failed to fire or misfired, that he walked into the kitchen and ejected two shells, and that he returned to the room where the victim was. This testimony provided proof from which a jury could conclude that the Petitioner premeditated the killing. We conclude that the evidence does not preponderate against the trial court's findings relative to trial counsel's use of expert witnesses. The Petitioner is not entitled to relief.

The Petitioner's final claim is that counsel were ineffective by failing to present expert proof that the Petitioner lacked the mens rea for first degree murder. We note that counsel offered the testimony of two experts, Dr. Auble and Dr. Caruso, and attempted to offer Dr. Goetting's testimony on this point. As noted by the trial court, the Petitioner failed to offer

-19-

any expert proof to this effect at the hearing. Without evidence that favorable defense expert testimony would have been available to trial counsel, the Petitioner cannot establish that counsel's performance was deficient or that he was prejudiced by counsel's failure to avail the defense of such a witness. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE